**PENSION FUND—MID JERSEY TRUCKING INDUSTRY—LOCAL 701, et al., Plaintiffs,**

v.

**OMNI FUNDING GROUP, et al., Defendants.**

**Civ. No. 84–4326(GEB).**

United States District Court, D. New Jersey.

Feb. 15, 1990.

Wilentz, Goldman & Spitzer by Marvin J. Brauth and Laura Studwell, Woodbridge, N.J., for plaintiffs.

Riker, Danzig, Scherer & Hyland by Benjamin P. Michel, Newark, N.J., for defendant Prudential–Bache Securities, Inc.

Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross by Thomas J. Demski and Mark E. Duckstein, Newark, N.J., for defendant Southeast Bank N.A. of Miami, Fla.

GARRETT E. BROWN, Jr., District Judge.

This memorandum and order resolves motions for summary judgment and attorney's fees made by defendant Prudential–Bache Securities, Inc. ("Pru–Bache") and Southeast Bank, N.A. of Miami, Florida ("Southeast Bank"). Plaintiff Pension Fund [1] filed this action on October 19, 1984, alleging that it was the victim of a conspiracy to misdirect and misappropriate over $20 million of its funds. Plaintiff has alleged that Southeast Bank and Pru–Bache are liable for a breach of fiduciary duty under ERISA, as well as state common law contract and negligence theories. Both Pru–Bache and Southeast Bank move for summary judgment as to plaintiff's ERISA claim and for attorney fees under 29 U.S.C. § 1132(g). Pru–Bache also moves for summary judgment as to plaintiff's state common law claims.

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In a summary judgment motion, the nonmoving party receives the benefits of all reasonable doubts and any inferences drawn from the underlying facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Fed.R.Civ.P. 56(e) also requires that when a nonmoving party bears the burden of proof at trial as to a dispositive issue, that party is required to go beyond the pleadings and

designate specific facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. For an issue of fact to be genuine, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. Issues of material fact are genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## I. PRU–BACHE'S SUMMARY JUDGMENT MOTION

### A. *Factual Background*

In its second amended complaint, Pension Fund alleges that it invested $20 million of its funds with defendant Omni Funding Group, Inc. ("Omni"), a Florida-based mortgage brokerage company, and its owner, defendant Joseph Higgins, on October 13, 1982. In June and July of 1983, Higgins approached Ray West, a broker at Pru–Bache, regarding investment of approximately $4 million of the Pension Fund monies into four Pru–Bache accounts. Two of the accounts, entitled "Omni Funding Group—Glades Citrus" and "Omni Funding Group—Mercer," were money market accounts and are not subjects of this litigation. The other two accounts, "Omni Funding Group 78, 79, 80" ("78, 79, 80") and "Omni–Holly Springs," ("Holly Springs") involved both risk arbitrage and money market accounts. Higgins opened the 78, 79, 80 account on July 28, 1983, with an investment of $2.3 million. At the time of opening, the arbitrage account of 78, 79, 80 was entitled "Omni Funding Group, Joseph J. Higgins, Pres." and the money market account was named "Omni Funding Group, in trust for Luis F. Vela." The subaccounts were later joined as 78, 79, 80. Higgins opened the Holly Springs account on

---

**1.** The other plaintiffs in this action are five trustees of the Pension Fund: Donald Minch, Rocco Morongello, Martin E. McDermott, Anthony L. Sidoti and Joseph Palughi. For the

purposes of this motion, the Court will refer collectively to all plaintiffs as "plaintiff" or "Pension Fund."

August 29, 1983 with an investment of $930,000.00.

Higgins closed all four accounts in 1984 after sustaining a loss of $550,000 according to Pru–Bache, and over $1 million according to plaintiff. The parties dispute whether Mr. West of Pru–Bache knew or should have known, either through conversations with Mr. Higgins or otherwise, that Pru–Bache was investing Pension Fund monies. The parties also dispute whether Pru–Bache acted in a discretionary or ministerial manner in investing the monies and whether Pru–Bache acted in accordance with the investment objectives established for these accounts.

## B. *The ERISA Claim*

Pension Fund seeks to hold Pru–Bache liable under ERISA for breach of its fiduciary duty. Alternatively, Pension Fund argues that Pru–Bache is liable under a theory of co-fiduciary liability for: (1) knowingly attempting to conceal Higgins' breaches of his fiduciary duty; (2) failing to comply with 29 U.S.C. § 1104(a)(1) and thus enabling Higgins to breach his fiduciary duty; and/or (3) failing to make reasonable efforts to remedy Higgins' breaches.

Pru–Bache argues that it cannot be a fiduciary of the Pension Fund assets under ERISA because it did not know and should not have known that Higgins had invested the funds on behalf of the Pension Fund. Pru–Bache further argues that, even if it were a fiduciary, it acted in accordance with investment objectives established by Mr. Higgins, and clearly informed him of the potential risks. In opposition to Pension Fund's co-fiduciary liability theory, Pru–Bache again argues that it had no knowledge that Higgins was a fiduciary of the Pension Fund assets.

### 1. Was Pru–Bache a Fiduciary?

ERISA provides that a person assumes fiduciary status with respect to an employee benefit plan to the extent:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A) (1987).

 Implicit in the definition of "fiduciary" is the requirement that the putative fiduciary knows or reasonably should have known that he or she is acting in a fiduciary capacity. Such a requirement is established by Department of Labor regulations,[2] which deserve great weight in the interpretation of ERISA, *cf., Helvering v. Winmill,* 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938), and common law trust principles,[3] which may be used in interpreting ERISA's provisions, *see Lowen v. Tower Asset Management, Inc.* 829 F.2d 1209, 1220 (2d Cir.1987). Thus, before it can determine whether Pru–Bache acted in a discretionary or ministerial manner with regard to the trust assets, the Court must first consider whether Pru–Bache has shown beyond a genuine issue of material fact that it did not know it was acting as a fiduciary for Pension Fund's assets.

Mr. Higgins testified at his deposition that he told Mr. West the Pension Fund was the source of the funds for the Omni accounts at Pru–Bache. Dep. of Joseph Higgins at 1762:9–20 (attached to Aff. of Marvin Brauth at Ex. B (June 30, 1989)). He further testified that he informed Mr. West that a portion of the monies going into the accounts represented security for Pension Fund loans. *Id.* at 1763:14–18.

---

**2.** [I]t is the view of the Department that, as a general matter, a person is not a fiduciary with respect to a plan if he does not know, and has no reason to know, that he is acting with respect to a plan.

40 Fed.Reg. 50,812–13 (1975).

**3.** *See* Restatement (Second) of Trusts § 102 comment a (1959).

Mr. Higgins also stated that he told Mr. West that a portion of the funds represented holdbacks or collateral security for loans. *Id.* at 1764:2–9, that another portion represented construction funds, *id.* at 1764:10–14, and that another represented payment reserve. *Id.* at 1764:15–19. Mr. Higgins further stated that on July 28, 1983 he sent to Mr. West a letter that referred to the collateral pledge agreement for the Sanctuary Loan as the "collateral pledge agreement, the Omni Funding Group, a Florida Corporation ("Lender") and to Luis F. Vela, as trustee ("Borrower")." *Id.* at 1766:17–1767:15.

Mr. West's deposition testimony contradicts many of Mr. Higgins' assertions. Mr. West asserts that at the time the accounts were opened, Mr. Higgins did not inform him that a pension fund was providing the funds for the investments. West Dep. at 100:3–7 (attached to Pru–Bache App. at Ex. 5). Mr. West also admitted that, prior to the opening of the accounts, Mr. Higgins had mentioned that he might be doing business with a pension fund. *Id.* at 98:19–22. Mr. West was not sure when this conversation occurred, *id.* at 98:23–25, but estimated it to be one to three months prior to opening the first account. *Id.* at 100:8–15. Mr. West further testified that, with the exception of one meeting with trustees of the Pension Fund, he had no contact with anyone from the Fund. *Id.* at 117:23–118:25. He claims that, although he attended the meeting, nothing was asked of him and nothing discussed at the meeting pertained to him. *Id.* at 117:20–22. At the meeting, Mr. West was introduced by Higgins merely as being from Pru–Bache. *Id.* at 114:13–20. Mr. West also claimed he did not know why Mr. Higgins had asked him to attend the meeting. *Id.* at 114:9–12. Finally, Mr. West testified that, at the time the accounts for Omni were opened, he was not aware that the accounts were opened in connection with mortgage loans, *id.* at 144:1–4; that the accounts were being opened by Omni in connection with a business dealing it had with the Pension Fund, *id.* at 144:5–8; or that the accounts contained construction monies, or security for loans. *Id.* at 144:9–15.

Summary judgment generally is inappropriate when resolution of conflicting evidence depends on issues of credibility. 10A C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure* (Civil 2d) § 2726 (1983). Pru–Bache argues, however, that this Court should disbelieve Mr. Higgins' testimony because it contradicts prior deposition testimony taken on June 12, 1985, before Mr. Higgins' indictment on conspiracy charges.

■ Courts uniformly have held that a party may not defeat a motion for summary judgment by filing an affidavit that, without any new evidence, merely contradicts prior deposition testimony. *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 544 (9th Cir.1975); *Perma Research and Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969); *Reitmeier v. Kalinoski,* 631 F.Supp. 565, 574 (D.N.J. 1986). Moreover, a court may disregard contradictory evidence if it is "too incredible to be believed by reasonable minds." *Trigo Hnos., Inc. v. Premium Wholesale Groceries, Inc.,* 424 F.Supp. 1118, 1129 (S.D.N.Y.1976) (quoting 6 *Moore's Federal Practice* (2d Ed.1976) pp. 56–523–4). These rules are consistent with the purpose of summary judgment, which is to identify real and genuine issues for trial. *See Radobenko,* 520 F.2d at 544; *Perma,* 410 F.2d at 578. They do not, however, compel the rejection of Higgins' testimony here. This is not a case where a nonmoving party files an affidavit in an attempt to stave off summary judgment against his own claims. Mr. Higgins neither wins nor loses by the granting or denial of Pru–Bache's summary judgment motion. Moreover, Mr. Higgins gave general deposition testimony, and did not file an affidavit whose sole purpose was to defeat summary judgment. Thus, the Court finds that Mr. Higgins' testimony is not designed to create a sham issue to defeat summary judgment. Nor can this Court find from the cold record that his testimony is too incredible to be believed. The Court therefore rejects Pru–Bache's position and considers Mr. Higgins' testimony.

■ Pru–Bache argues that, even if this Court considers Mr. Higgins' testimony, summary judgment still is appropriate because Mr. Higgins did not expressly disclose to Pru–Bache that it would be acting as a fiduciary for the Pension Fund. In support, Pru–Bache refers this Court to a Department of Labor Regulation at 40 Fed. Reg. 50,813 (1975), which provides:

[A] plan fiduciary may not delegate such discretionary authority to a broker-dealer in the execution of a securities transaction as to make such broker-dealer a fiduciary with respect to a plan within the meaning of Section 3(21)(A) of the Act and paragraph (d) of this regulation without disclosing to such broker-dealer that it will be acting as a fiduciary with respect to the plan in such a transaction.

Pru–Bache's argument in this regard is meritless. As discussed *supra*, there exists a genuine issue of fact, based on Mr. Higgins' testimony, whether his communications to Mr. West served as a disclosure. Moreover, the Pension Fund has presented evidence that West and Pru–Bache knew that the 78, 79, 80 Fund was originally a fund held in trust for Luis F. Vela. *See* Aff. of Marvin Brauth at Exs. G & K. This evidence, taken in combination with Mr. Higgins' testimony, and given all reasonable inferences in plaintiff's favor, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), creates a genuine issue of fact as to whether Mr. West and Pru–Bache had knowledge that it owed a fiduciary duty to the Pension Fund.

■ Having determined that there exists a genuine issue of fact as to Pru–Bache's knowledge, the Court must next consider whether Pru–Bache was a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A). The essential inquiry here is whether Pru–Bache performed a discretionary or ministerial function as Higgins' broker. Pru–Bache argues that it had no discretionary power regarding the accounts and therefore cannot be considered a fiduciary under 29 U.S.C. § 1002(21)(A). Pru–Bache asserts that Mr. West could not trade with account monies unless the transactions were approved by Mr. Higgins, *see* West

Dep. at 56:23–58:19 (attached to Pru–Bache App. at Ex. 5); Higgins Dep. 922:17–20 (attached to Pru–Bache App. at Ex. 6). Pru–Bache also offers the deposition of Mr. West, who testified that he and Pru–Bache dealt only with Higgins and believed the funds in the Omni accounts belonged to Higgins, West Dep. at 39:11–16; *id.* at 125:14–126:8; that neither West nor Pru–Bache had any contact with the Pension Fund regarding the Omni accounts, *id.* at 113:1–11; and that they did not know Higgins had an agreement with the Pension Fund, or of plaintiff's interest in these accounts, *id.* at 119:1–8; 144:5–8. Although much of this testimony goes only to the issue of whether Mr. West or Pru–Bache knew it was investing Pension Fund monies, Pru–Bache argues that, even assuming *arguendo* it knew Higgins was investing on behalf of the Pension Fund, it could not assume fiduciary status because all investment decisions ultimately were made by Mr. Higgins.

The Pension Fund argues in opposition that Mr. West and Pru–Bache became fiduciaries by virtue of their role as investment counsellors, regardless of whether Mr. Higgins had ultimate decision-making authority. In support of its position, the Pension Fund points to the deposition testimony of Mr. West in which he admits that he viewed his function as to "recommend the type of investments in risk arbitrage that [he] would suggest that Higgins go into for Omni." West Dep. at 119:9–14 (attached to Aff. of Marvin Brauth at Ex. E). The Pension Fund corroborates West's admissions with the deposition of Mr. Higgins, who testified that Mr. West made all the buy and sell recommendations for the investments, that he followed Mr. West's advice, and that he had "no input" into such transactions. Higgins Dep. at 1771 (attached to Aff. of Marvin Brauth at Ex. B).

Based on the above conflicting testimony, the Court finds that a genuine issue exists whether Pru–Bache falls within the definition of "fiduciary" under 29 U.S.C. § 1002(21)(A) by virtue of the investment advice it purportedly gave to Mr. Higgins. *See* 29 U.S.C. § 1002(21)(A)(ii). Depart-

ment of Labor regulations amplify on this requirement:

A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of Section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1974 (the Act) and this paragraph only if:

(i) such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; and

(ii) such person either directly or indirectly . . .

(A) Has discretionary authority or control, whether or not pursuant to an agreement, arrangement, or understanding, with respect to purchasing or selling securities or other property for the plan; and

(B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3–21(c). The evidence presented for this motion raises a genuine issue as to whether Mr. Higgins sufficiently relied on Pru–Bache's advice so that Pru–Bache assumed fiduciary status. The evidence shows that Mr. West viewed his role as an advisor to Mr. Higgins, and that Mr. Higgins claims such advice was the primary basis of his investment decisions.

Moreover, Pru–Bache, in arguing in the alternative that it did not breach its fiduciary duty because it acted in accordance with Mr. Higgins' objectives, implicitly admits those objectives' existence for the purposes of 29 C.F.R. § 2510.3–21(c)(1)(ii)(B). Finally, neither party disputes that Pru–Bache received a fee in return for its services. Accordingly, Pension Fund has raised a genuine issue of fact whether, *inter alia*, Pru–Bache qualifies as an ERISA fiduciary within the meaning of 29 U.S.C. § 1002(21)(A)(ii) and 29 C.F.R. § 2510.3–21(c)(1). Moreover, the facts of record raise a genuine issue as to whether Pru–Bache exercised discretion respecting management over plan assets, thereby raising a genuine issue as to whether Pru–Bache qualifies as an ERISA fiduciary under 29 U.S.C. § 1002(21)(A)(i).

### 2. Did Pru–Bache Breach its Fiduciary Duty?

■ Pension Fund maintains that Pru–Bache breached its fiduciary duty by disbursing Pension Fund monies "in violation of the Agreements,"[4] and "investing funds of the plaintiff . . . in such a fashion as to cause dissipation of those funds." Second Amended Complaint at ¶¶ 44(b) and (c). Pru–Bache argues that it did not breach any fiduciary duty it had because it provided recommended investments suitable to the investment objectives specified by Mr. Higgins and clearly informed Higgins of the risks involved. Pru–Bache also argues that it diversified investments in accordance with Higgins' objectives. Finally, Pru–Bache claims that it cannot be held liable for failing to make investments pursuant to documents and instruments governing the plan because it was never apprised of such documents' existence.

Section 404(a)(1) of ERISA provides that a fiduciary shall discharge his duties with respect to a plan:

A. for the exclusive purpose of:

---

**4.** These "Agreements" included a Trust Indenture, Commitment Agreement and Whole Loan Sale and Servicing Agreement. *See* Pru–Bache App. at Exs. 1–3. The Trust Indenture was entered into by Pension Fund, Omni, and South-east Bank on October 13, 1982. The Commitment Agreement and the Whole Loan Sale and Servicing Agreement, also signed on October 13, 1982, was entered into only by Pension Fund and Omni.

(i) providing benefits to participants and their beneficiaries;

(ii) defraying reasonable expenses of administering the plan;

B. with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

C. by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; *and*

D. in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

29 U.S.C. § 1104(a)(1). The chief contention between the parties in this regard is whether Pru–Bache had an affirmative duty to inquire into the source of Higgins' authority and determine the interests of the Pension Fund before making investment recommendations, or whether its duty extended only to inquire as to the appropriateness of certain investments with regard to the investment objectives as established by Mr. Higgins. Pension Fund argues that once Pru–Bache knew that Mr. Higgins was investing Pension Fund monies, Pru–Bache assumed a duty to inquire not just into the appropriateness of the investment in accomplishing the objectives established by Mr. Higgins, but to determine whether Mr. Higgins' investment objectives were in the best interests of the Pension Fund. Pru–Bache argues that it had no duty to second-guess Mr. Higgins' authority or investment strategy, that the advice it gave conformed to Mr. Higgins' objectives, and that it therefore did not breach any duty.

The Court need not resolve this issue for present purposes, because, even assuming that Pru–Bache had properly characterized its fiduciary duty under ERISA, there still remains a genuine issue of fact whether the investment advice it gave was reasonable under the circumstances. Mr. Higgins testified at deposition that he told Mr. West that part of the funds represented holdbacks or collateral security for loans, that another portion represented construction funds, and another, payment reserve. *See* Higgins Dep. at 1764:2–19 (attached to Brauth Aff. at Ex. B). Pru–Bache's recommendation that part of these monies be invested in arbitrage accounts therefore must be evaluated under the reasonableness test laid out in 29 U.S.C. § 1104(a)(1)(B). A determination of reasonableness, however, is properly a question for the jury, and is inappropriate in the summary judgment context. Moreover, Pension Fund has submitted an expert's report by Michael Ferri, Ph.D., in which Mr. Ferri concludes that Pru–Bache acted unreasonably in giving its investment advice to Higgins. *See* Brauth Aff. at Ex. A. This report also satisfies Pension Fund's burden of showing the existence of a genuine issue of fact, thereby making summary judgment inappropriate.

■ Pru–Bache also has moved for summary judgment against plaintiff's claim that it is liable as a fiduciary for the breaches of its co-fiduciary, Higgins. Specifically, Pension Fund asserts that Pru–Bache knowingly attempted to conceal Higgins' breach of fiduciary duty, failed to comply with 29 U.S.C. § 1104(a)(1) and thus enabled Higgins to breach his fiduciary duty; and failed to make reasonable efforts to remedy Higgins' breaches once they became apparent. *See* 29 U.S.C. § 1105(a). Summary judgment also would be inappropriate on this cause of action, as there remains a genuine issue whether Pru–Bache knew Higgins was acting as a fiduciary for the Pension Fund. *See* I.B.1. *supra.*

C. *Pension Fund's State Common Law Claims*

In addition to its ERISA claims, the Pension Fund has brought two types of state claims. The first sounds in negligence, and is directly asserted against Pru–Bache by the Pension Fund. The second are claims for a breach of the brokerage contracts

between Pru–Bache and Omni. The Pension Fund asserts that it has standing to bring these claims under the alternate theories that it was a third party beneficiary of the brokerage contracts, and that it is the assignee of all claims by Luis F. Vela and Holly Springs Golf and Country Club ("Holly Springs"), who were also third party beneficiaries of the contract. Section 514(a) of ERISA provides that ERISA "supercede[s] any and all state laws insofar as they may now or hereafter *relate to* any employee benefit plan...." 29 U.S.C. § 1144(a) (emphasis added). The Supreme Court has recently reiterated that the "express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulations as exclusively a federal concern.'" *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45–46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (citing *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)). In *Pilot Life*, the complaint contained state law causes of action for tortious breach of contract, breach of fiduciary duty, and fraud in the inducement. *Id.*, 481 U.S. at 43, 107 S.Ct. at 1551. The Supreme Court found that there was "no dispute that the common law causes of action ... 'related to' an employee benefit plan and therefore fall under ERISA's express preemption clause...." *Id.* at 47, 107 S.Ct. at 1553. *See also, Pane v. RCA Corp.*, 667 F.Supp. 168, 172 (D.N.J. 1987) (state law claim for breach of severance agreement preempted by ERISA).

It is beyond dispute that the Pension Fund's negligence claims are preempted by ERISA. Indeed, counsel for plaintiff admitted so at oral argument. The parties dispute, however, whether the breach of contract claims are preempted as well.

■ The Court finds that the broad preemption provisions of ERISA preempt the Pension Fund's breach of contract claim based on the Pension Fund's third party beneficiary status. In asserting it is a third party beneficiary, the Pension Fund is in fact claiming that some benefit inured

directly to it. Accordingly, this cause of action "relates to" an employee benefit plan and is therefore preempted. If a plaintiff seeks recovery of pension fund monies, the claim "relates to" the benefit plan, no matter how the claim is characterized. *See Shiffler v. Equitable Life Assurance Soc'y*, 838 F.2d 78, 81 (3d Cir.1988).[5]

■ The Pension Fund's assigned claims, however, are not preempted. The Pension Fund received an assignment of all claims by Vela and Holly Springs by settlement agreements entered into on October 15, 1986 and December 12, 1986, respectively. As assignee, the Pension Fund steps into the shoes of the assignor and may assert the assignor's claims as if they were its own. *Moutsopoulos v. American Mutual Ins. Co.*, 607 F.2d 1185, 1189 (7th Cir.1979); *Citizens & Southern Nat'l Bank v. Bruce*, 420 F.Supp. 795, 799 (E.D. Mo.1976), *aff'd*, 562 F.2d 590 (8th Cir.1977); *Abeles v. Adams Eng'g Co.*, 64 N.J.Super. 167, 187, 165 A.2d 555 (App.Div.1960), *modified on other grounds*, 35 N.J. 411, 173 A.2d 246 (1961). The Pension Fund's assertion of the assignor's claims do not "relate to" the Pension Fund monies. Rather, they are straightforward breach of contract claims against the brokerage house. Had the borrowers themselves brought these claims, there would be no preemption. This result does not change by the assignment of the borrower's claims to the Pension Fund.

The Court therefore considers the merits of Pru–Bache's summary judgment motion against the Pension Fund's assigned claims. Resolution of this motion requires consideration of three issues: 1) whether Luis Vela and Holly Springs were intended beneficiaries of the brokerage agreement between Omni and Pru–Bache, 2) whether Pru–Bache in fact breached any duty it owed to Omni under the contract, and 3) whether Omni and the third party beneficiaries are estopped from asserting a claim against Pru–Bache.

---

5. Although *Shiffler* involved the recovery of pension benefits from an employee benefit plan, the Third Circuit's reasoning regarding preemption is equally applicable to the instant case.

Both brokerage contracts at issue contain provisions that New York law shall govern the interpretation of the contract. *See* Def.'s App. at Ex. 10, p. 2; *id.* at Ex. 15, p. 3. Under New York law, a party qualifies as a third party beneficiary to a contract if the contracting parties intended to confer upon the third party an immediate, rather than incidental, benefit. *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 336, 464 N.Y.S.2d 712, 451 N.E.2d 459 (Ct.App.1983); *Bonwell v. Stone*, 128 A.D.2d 1013, 1014, 513 N.Y.S.2d 547 (3d Dept.1987). A party need not be named in the contract to establish that he or she is a third party beneficiary. *Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir.1979). Indeed, intent to confer a benefit on a third party may be determined from either the agreement or surrounding circumstances. *American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 449 (S.D.N.Y.1976).

The Court finds that a genuine issue of fact exists as to whether Mr. Vela and Holly Springs were intended beneficiaries. As noted, *supra*, the Pension Fund has submitted evidence that Mr. West and Pru–Bache knew the 78, 79, 80 account was held in trust for Mr. Vela. *See* Aff. of Marvin Brauth at Exs. G & K; Higgins Dep. at 1766:17–1767:15 (attached to Aff. of Marvin Brauth at Ex. B). This evidence is sufficient to raise a genuine issue of fact as to the party's intention to make Luis Vela and Holly Springs a third party beneficiary.

The next issue the Court considers is whether Pru–Bache breached any duty to Omni. Pru–Bache argues that it did not breach any duty, or, in the alternative, that Pension Fund is estopped from raising unsuitability claims against Pru–Bache because Higgins approved all the trading Pru–Bache conducted. The Pension Fund relies upon, *inter alia*, the expert report of Michael G. Ferri as evidence that Mr. West and Pru–Bache breached their duty as investment brokers in making certain investment decisions. *See* Brauth Aff. at Ex. A. This report alone creates a genuine issue of fact. Moreover, there is a genuine factual dispute underlying the duty West owed to Mr. Higgins. Pru–Bache asserts that Higgins was a sophisticated investor to whom Mr. West owed a lesser duty of care, whereas the Pension Fund claims that Mr. Higgins relied exclusively on Mr. West's investment advice. This dispute creates a genuine issue not only as whether Pru–Bache breached a duty to Omni, but whether Omni may be estopped from asserting claims that Pru–Bache engaged in unsuitable trading. *See Karlen v. Ray E. Friedman & Co. Commodities*, 688 F.2d 1193, 1198–1200 (8th Cir.1982); *Hackett v. Reynolds & Co.*, 577 F.2d 948, 950–51 (5th Cir. 1978); *Campbell v. Paine Webber Jackson & Curtis*, Civ. No. 83–6095 Slip Op. (E.D.Pa. April 15, 1986) (available on Lexis). Accordingly, summary judgment is inappropriate.

## II. SOUTHEAST BANK'S SUMMARY JUDGMENT MOTION

### A. *Factual Background*

In August of 1982, Higgins approached Southeast Bank to inquire whether it wished to be involved in a situation where Omni would manage Pension Fund monies through Southeast Bank. Omni and Pension Fund entered into a Letter–Memorandum of Understanding on October 7, 1982, in which both signatories agreed that Omni would manage certain Pension Fund monies through investments in residential and commercial mortgages. Thereafter on October 13, 1982, Pension Fund, Omni, and Southeast Bank entered into a Trust Indenture. Also signed on that day were a Whole Loan Sale and Servicing Agreement and a Commitment Agreement between Pension Fund and Omni, as well as an Investment Management Agreement between Omni and Southeast Bank. *See* Aff. of Thomas Demski at Ex. C (Letter–Memorandum of Understanding); Ex. D (Trust Indenture); Ex. A (Whole Loan Sale and Servicing Agreement); Ex. B. (Commitment Agreement); Ex. F (Investment Management Agreement). Although Southeast Bank was not a signatory to either the Whole Loan Sale and Servicing Agreement or the Commitment Agreement,

the Trust Indenture incorporated both by reference. Demski Aff. at Ex. D. § XLI.

Under the Trust Indenture and incorporated agreements ("the Agreements"), Pension Fund authorized Omni to grant residential and commercial mortgages using Pension Fund monies deposited in an Acquisition Fund established at Southeast Bank. Southeast Bank was obligated to apply monies in the Acquisition Fund to the purchase of mortgage loans originated by Omni once the following documents were deposited:

(a) with the Bank, the original Mortgage Note, properly endorsed to the Buyer without recourse to the Seller;

(b) with the Bank, a copy of the Mortgage with evidence of recordation in the real estate records noted thereon;

(c) with the Bank, a copy of the assignment of the Mortgage to the Buyer, and evidence of recordation or filing for recordation of such assignment;

(d) with the Bank, the mortgagee title insurance policy, or evidence of same;

(e) with the Bank, evidence satisfactory to the Seller that the single family residence is covered by either a standard hazard insurance policy, or a mortgage single interest hazard insurance policy as required; and

(f) with the Seller, a certificate of the Private Mortgage Insurer evidencing private mortgage insurance coverage in the amount as required in (iv) above.

Trust Indenture at § XXI(v). Also pursuant to the Trust Indenture, mortgages would be purchased only if, *inter alia*, 1) the mortgage constituted a first or second lien on the premises, *id.* at § XXI(ii); 2) the mortgage loans were secured by premises covered by hazard insurance equal to the amount of the outstanding mortgage, *id.* at § XIX; and 3) the mortgage loan was not

made with respect to bars and taverns, automobile agencies, restaurants, gambling casinos, bowling alleys, or imprudent investments. *Id.* at § V. Moreover, commercial mortgage loans were not to exceed 80% of the property's appraised value, no single commercial mortgage loan was to exceed 10% of the $20 million portfolio, and commercial mortgage insurance was to be provided in an amount at least equal to 15% of the appraised value of the property. *Id.*[6] Finally, Southeast Bank was given discretion to invest the money not used in the Acquisition Fund in short-term investments, thus becoming a fiduciary with respect to those funds. *See* Investment Management Agreement at ¶ 1 (attached to Demski Aff. at Ex. F).

The first mortgage loan from the Acquisition Fund was distributed in December of 1982. In total, twenty-one loans were made to seventeen different borrowers over the course of approximately two years. In 1984, several loan defaults came to the attention of the Pension Fund trustees. It was then discovered that Omni and Pension Fund's ex-trustees had engaged in a criminal conspiracy to defraud the Fund out of its monies. Pension Fund alleges that it suffered losses of $13 million.

Pension Fund raises two causes of action against Southeast Bank. The first, not addressed by Southeast Bank's motion, is a claim that Southeast Bank was negligent in failing to abide in every instance with the requirements imposed on it by the Agreements. The second, an ERISA claim, alleges that Southeast Bank breached its fiduciary duty, its co-fiduciary duty, or, in the alternative, that the Bank is liable under ERISA as a non-fiduciary that knowingly participated in the scheme perpetrated by Omni and Mr. Higgins.

Pension Fund alleges, *inter alia*, four instances of conduct which, it argues, make

---

**6.** The Trust Indenture also contained the following provisions: (1) the Bank was not obligated to initiate or defend any legal proceedings without indemnity (§ XXII); (2) the Bank was not responsible to insure the validity or proper execution of any document nor to issue that the duties imposed upon any other party were performed (§ XXIII); (3) the Bank was not liable because of any failure of Omni to perform any

of its obligations or to see to the proper application of any of the proceeds of any of the mortgages granted by Omni (§ XVIV); (4) the Bank was entitled to rely in good faith upon any certification, statement, or other document furnished by Omni and not obligated to investigate or inquire into such statements or instruments (§§ XXIV and XXXII).

the Bank liable under ERISA. First, the Fund asserts that the bank permitted holdbacks of 15% of the mortgage loans in lieu of ensuring that mortgage insurance equalling at least 15% of the appraisal value was taken out on each loan. The holdbacks then were improperly used to pay Omni what it was owed on monthly mortgage payments. Omni then would use those monies paid from the Bank to pay off outstanding mortgage loans, thereby collecting a profit on the interest paid back to the Bank. As a consequence, Pension Fund argues, Higgins and his cohorts would line their pockets while draining out the already insufficient loan security from the Acquisition Fund. Second, Pension Fund accuses the Bank of accepting copies of certain documents instead of originals, and thereby conducting closings without proper documentation. Third, Pension Fund alleges that the Bank disregarded a requirement in the agreements that no commercial loan exceed 10% of the Pension Fund's portfolio (approximately $2 million). In mid 1983, Pension Fund alleges, Mr. Higgins and Omni improperly and without authorization eliminated this requirement and replaced it with a fixed $5 million limit. This unauthorized change led to the lending of over $16 million to three borrowers.[7] Fourth and finally, Pension Fund contends that the Bank made some mortgage loans that were not secured by a first or second lien.

### B. *Analysis*

1. Southeast Bank's Fiduciary Liability.

Southeast Bank concedes that it was a fiduciary with regard to the short-term investments it was authorized to make pending dispensation of the money into mortgage loans. The primary issue for this summary judgment motion is whether Southeast Bank was a fiduciary by virtue of its conduct concerning the mortgage loans. This issue breaks down into two:

whether the agreements vested Southeast Bank with discretionary authority concerning the mortgage loans, and, if not, whether Southeast Bank actually exercised discretionary authority.

A party becomes a fiduciary with regard to pension fund assets when it is vested with or exercises discretionary authority. 29 U.S.C. § 1002(21)(A) (statute fully set out in I.B.1 *supra* ); *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146 (3d Cir.1989). There is no simple test to determine whether a bank is an ERISA fiduciary when it acts as a "directed trustee" following instructions of another fiduciary or acting as a custodian of plan assets. *See Robbins v. First American Bank of Virginia*, 514 F.Supp. 1183 (N.D.Ill.1981). There are, however, a number of cases which are instructive. In *Brandt v. Grounds*, 687 F.2d 895 (7th Cir.1982), the Seventh Circuit held that a bank did not assume fiduciary status merely by performing its depository functions during embezzlement transactions. The Court reasoned that the banks' duty to honor withdrawal slips did not create the additional duty of "analyzing the transaction, determining its prudence, and refusing the withdrawal if it appeared imprudent." *Id.* at 898.[8] Similarly, in *O'Toole v. Arlington Trust Co.*, 681 F.2d 94 (1st Cir.1982), the First Circuit rejected plaintiff's argument that the bank had breached a fiduciary duty under ERISA when it used a pension fund's monies to offset outstanding loans owed by three nursing homes. The First Circuit concluded that the bank's responsibilities as a depository did not include the discretionary, advisory activities described by the statute. *Id.* at 96.

Perhaps the most detailed discussion of a bank's fiduciary duty under ERISA appears in *Robbins v. First American Bank*, 514 F.Supp. 1183 (N.D.Ill.1981). In *Rob-*

---

**7.** Specifically, the Bank made two loans to "Luis Vela as Trustee" totalling $5 million, a $3 million loan to Holly Springs Golf and Country Club, and a $8.6 million loan to Consumer Coal Co., its subsidiary Coal Production of Hazard, Inc., and its sister company Prince Resources, Inc.

**8.** The Court in *Brandt* also recognized that the bank was liable as a fiduciary under ERISA for the investment advice it provided, but limited that duty to the scope of the investment advice.

*bins*, the defendant bank entered into a loan agreement with a co-defendant borrower, and the plaintiff pension fund, for the acquisition and development of some land. Pursuant to the agreement, the pension fund loaned ninety percent of the total loan proceeds, with the bank providing the remainder. The pension fund brought suit alleging that more money was borrowed than was necessary for the land development and that substantial sums were diverted for purposes unrelated to the development project. Plaintiff brought an ERISA claim against the bank, asserting that the bank acted as a fiduciary in regard to the funds.[9] The district court rejected the ERISA claim, finding that the bank was not a fiduciary:

> In the instant case, the bank was merely a servicing agent for a particular investment. The bank was never itself involved with the administration or management of the fund itself or in making its investment policies and decisions. The bank was required to fulfill various ministerial functions respecting one investment, including making advances to the borrower and remitting loan repayments to plaintiffs. The fixed terms of the loan and the commercial nature of the transaction belie the plaintiff's allegations of sufficient discretionary responsibility to come within the terms of [ERISA].

*Id.* at 1190–91. This decision in *Robbins* is consistent with federal regulations, *see* 29 C.F.R. § 2509.75-8,[10] and existing law in this Circuit, *see Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse,* 879 F.2d 1146 (3d Cir. 1989) (auditor that breached general statutory duty of care in conducting audit not an ERISA fiduciary), as well as the Ninth Circuit, *see Hibernia Bank v. International Brotherhood of Teamsters,* 411 F.Supp. 478 (N.D.Cal.1976).

9. The bank's obligations to the pension fund in *Robbins* were determined in the following letter agreement:

"You [the Bank] are hereby appointed our agent for the purpose of performing the following services:
1. To receive the employer remittance forms and payments.
2. To deposit all employer payments to a daily interest savings account on the day received.
3. To process all information on the remittance forms and supply us with daily accounting.
4. To pay by trust cashiers check, monthly upon the direction of Mr. Kenneth W. Carlson, the applicable insurance premium.
5. To pay by trust cashiers check, to the Teamster [Security] Fund of Northern California, monthly upon the direction of Mr. Kenneth W. Carlson, the applicable administrative fees.
6. From time to time, to make transfers from the trust savings account to our commercial account as directed by Mr. Kenneth W. Carlson.
7. To render from time to time detailed statements of the trust account.
This agreement shall remain in effect until terminated either by you or by us by written notice mailed to the other at our last known addresses, respectively. If this agreement is terminated by such notice, you shall be reimbursed and held harmless for any loss suffered from any action taken in good faith prior to receipt by you of actual knowledge of termination.

You shall receive for your services a reasonable annual fee, said fee to be mutually agreed upon."

*Id.* at 1190 n. 2. Paragraph 5 of the loan participation agreement also stated:
[the bank] agrees that for so long as it holds the Note and the documents securing said Note, and as long as the Credit Agreement is in effect, it will not modify, amend, or terminate said agreements with [borrower] nor take any other action without participant's written consent.

10. This regulation defines the following activities as *not* creating a fiduciary duty under ERISA:
(1) Application of rules determining eligibility for participation or benefits;
(2) Calculation of services and compensation credits for benefits;
(3) Preparation of employee communications material;
(4) Maintenance of participants' service and employment records;
(5) Preparation of reports required by government agencies;
(6) Calculation of benefits;
(7) Orientation of new participants and advising participants of their rights and options under the plan;
(8) Collection of contributions and application of contributions as provided in the plan;
(9) Preparation of reports concerning participants' benefits;
(10) Processing of claims; and
(11) Making recommendations to others for decisions with respect to plan administration.

Applying the above standards to the instant case, the Court finds that Southeast Bank was not vested with discretionary authority. Southeast Bank followed strict guidelines regarding the payout of monies. It provided no guidance as to which loans were best suited to the Pension Fund's needs, and had no authority to prevent disbursement of funds if all the conditions were met and Omni so ordered. Accordingly, Southeast Bank's duties are sufficiently analogous to the duties of the banks in *Brandt, O'Toole, Robbins,* and *Hibernia Bank.*

■ Pension Fund argues in the alternative that Southeast Bank may be considered a fiduciary because it actually exercised discretionary authority. Pension Fund correctly asserts that the mere exercise of discretionary authority may give rise to fiduciary liability under ERISA. *See* 29 U.S.C. § 1002(21)(A)(i); *Yeseta v. Baima,* 837 F.2d 380, 386 (9th Cir.1988). Breach of a ministerial duty does not, without more, impose a fiduciary duty on the Bank. Whereas a breach of duty may reflect an independent decision not to follow instructions, this decision itself does not equate with an exercise of discretion. *See Brandt,* 687 F.2d at 895; *O'Toole,* 681 F.2d at 95; *Robbins,* 514 F.Supp. at 1189–1191; *Hibernia Bank,* 411 F.Supp. at 488–490. The Pension Fund has not demonstrated that Southeast Bank actually exercised discretion, but instead has shown only that Southeast Bank failed to follow instructions. Assuming *arguendo* that Southeast Bank failed to abide by the Trust Indenture, its failure to do so amounted to no more an exercise of discretion than had it complied with its terms. Accordingly, Southeast Bank is not a fiduciary under 29 U.S.C. § 1002(21)(A).

Having found that Southeast Bank was not a fiduciary beyond its limited role in investing Acquisition Fund monies in short term investments pending disbursement of all the loan monies, this Court is not presented with any claim that Southeast Bank breached its fiduciary duty in that regard. Pension Fund, however, has raised two additional arguments which, it contends still permit an ERISA claim against Southeast Bank. First, Pension Fund argues that the Bank is liable as a co-fiduciary for knowing participation in Omni's breaches of its fiduciary duty, for failing to act prudently and thereby enabling Omni to breach its fiduciary duties, and for failing to remedy Omni's breaches once they became apparent. Second, plaintiff argues that the Bank may be held liable under ERISA for losses resulting from Omni's breaches, regardless of whether it is a fiduciary.

## 2. Southeast Bank's Co-fiduciary Liability.

■ Southeast Bank concedes that it was a fiduciary for the limited purpose of short-term investments. It argues, however, that it is liable as a co-fiduciary only to the extent of the transactions in which it served as a fiduciary. Thus, Southeast Bank claims it cannot be found liable as a co-fiduciary for Omni's breaches regarding the mortgage loans because it was not a fiduciary with regard to such loans. The Court therefore must decide as a preliminary matter whether ERISA requires a causal connection between a fiduciary's role and the breaches of the co-fiduciary.

Legal authority on this point is sparse. Federal regulations provide that fiduciary liability may be limited to the fiduciary's functions, but that "any fiduciary may become liable for breaches of fiduciary responsibility committed by another fiduciary of the same plan under circumstances giving rise to co-fiduciary liability, as provided in section 405(a) of the Act." 29 C.F.R. § 2509.75–8, FR–16A. This regulation, although it speaks in terms of *any fiduciary* being liable for breaches of a co-fiduciary, is limited in scope by the requirement that such liability must fall within the circumstances elaborated in section 405(a) of ERISA.

More helpful is the reasoning employed in *Brandt v. Grounds,* 502 F.Supp. 598 (N.D.Ill.1980), *aff'd,* 687 F.2d 895 (7th Cir. 1982). In *Brandt,* a pension fund brought an ERISA action against a bank and a trustee-fiduciary to recover missing funds. The pension fund argued that because the

bank rendered investment advice, it was a fiduciary, and therefore liable for "any and all misconduct by other fiduciaries, even where there is no relationship or connection between the Bank's investment advice and the co-fiduciaries' misconduct." *Brandt, supra,* 502 F.Supp. at 598–99. The court granted the bank's motion to dismiss, reasoning:

> While ERISA surely expands the duties of all fiduciaries and trustees and, to some extent, modifies the common law of trusts regarding pensions ... it does not create liability for a co-fiduciary in a situation where the wrongdoing is wholly beyond the control of the co-fiduciary and outside the scope of responsibility defined by the statute.

> Plaintiffs do not allege any breach by the Bank relative to its investment advice or any loss suffered by the trust fund as a result of the investment advice. *If the language of the statute is to be given effect, there must be a causal connection between the advice rendered and the harm suffered. To hold otherwise would, in effect, make every fiduciary of a pension plan covered by ERISA an insurer of that plan, no matter how limited that fiduciary's duties.*

*Id.* at 599 (citations omitted) (emphasis added). This reasoning is persuasive. Plaintiff has not shown any causal relationship between Southeast Bank's fiduciary duty concerning short term investments and the alleged fraudulent conduct surrounding the mortgage loans. Accordingly, this Court holds that the Bank may not be held liable as a co-fiduciary.

The Pension Fund argues that the *Brandt* case is distinguishable on its facts. Specifically, Pension Fund argues that *Brandt* applies only to claims against fiduciaries who, through their failure to carry out their responsibilities, enabled another fiduciary to breach its duty. *See* 29 U.S.C. § 1105(a)(2). Pension Fund claims that because it has asserted co-fiduciary claims under 29 U.S.C. § 1105(a)(1) and § 1105(a)(3), as well, the causal connection requirement of *Brandt* is inapplicable.

This Court is unpersuaded. Although the *Brandt* case dealt specifically with co-fiduciary liability under 29 U.S.C. § 1105(a)(2), the Court sees no reason why the *Brandt* holding should be so limited. A fiduciary's responsibilities may indeed be broad under ERISA. But that responsibility must be limited to the scope of the fiduciary's duties. To further broaden the fiduciary's liability would result in manifest unfairness. For instance, a party with a limited and discrete fiduciary duty could be held liable under § 1105(a)(3) if it knew of another fiduciary's breach and did not make reasonable efforts to remedy it, even if the first fiduciary has insufficient knowledge or experience to remedy the breach. As another example, a fiduciary that had breached its duty could expose all other fiduciaries to liability merely by sending a letter to each informing them of the breach, thereby putting them on notice. The Court further finds that the causal connection requirement of co-fiduciary liability in § 1105(a)(1) is implicit in the statute's language. Under that provision, a co-fiduciary is liable "if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach." 29 U.S.C. § 1105(a)(1). This provision clearly is designed to prevent fiduciaries from acting in concert to breach one of the fiduciary's duties. The Court cannot conceive of a situation in which co-fiduciaries could satisfy the test of § 1105(a)(1) without the existence of a causal connection. Finally, the Court agrees with and adopts the district court's reasoning in *Brandt* that ERISA does not contemplate that every plan fiduciary become an insurer of the entire plan. The Court therefore rejects the Pension Fund's theory of co-fiduciary liability.

### 3. Southeast Bank's Non–Fiduciary Liability.

■ Pension Fund also argues that Southeast Bank is liable under ERISA notwithstanding its lack of fiduciary status. Southeast Bank argues that this Court may not imply a cause of action against non-fiduciaries under ERISA. Currently, there is a split among the circuits over whether

ERISA provides a cause of action against non-fiduciaries, with most circuits answering this question in the affirmative. *Compare, Brock v. Hendershott,* 840 F.2d 339, 342 (6th Cir.1988); (ERISA provides cause of action against non-fiduciaries); *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1220–21 (2d Cir.1987) (same); *Fink v. National Savings & Trust Co.,* 772 F.2d 951, 958 (D.C.Cir.1985) (dicta); *Thornton v. Evans,* 692 F.2d 1064, 1078 (7th Cir.1982) (same); *with Nieto v. Ecker,* 845 F.2d 868, 871–73 (9th Cir.1988) (ERISA does not provide cause of action against non-fiduciaries). Although the Third Circuit has not expressly reached this issue, two district courts have recognized an ERISA cause of action against non-fiduciaries. *See Brock v. Gerace,* 635 F.Supp. 563, 569 (D.N.J. 1986) (Gerry, D.J.); *Donovan v. Bryans,* 566 F.Supp. 1258, 1266–67 (E.D.Pa.1983). In *Brock,* Judge Gerry found that a pension fund could bring claims against non-fiduciaries because, *inter alia,* such an action was contemplated by "well-established principles developed under the common law of trusts," *Brock, supra,* 635 F.Supp. at 569, and because such an action accorded with "Congress' stated intention that the Secretary [of the United States Department of Labor] have a full range of legal and equitable remedies available to protect plan participants and beneficiaries." *Id.* (citing S.Rep. No. 127, 93d Cong.2nd Sess., *reprinted in* 1974 U.S.Cong. & Ad.News 4639, 4871); *see also, Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wis. 1979). The district court in *Donovan* also relied on the statute's legislative history to imply a cause of action against a non-fiduciary who, in collaboration with plan trustees, received an improper loan from the plan. *Donovan,* 566 F.Supp. at 1266–67.

In the absence of binding precedent, the Court undertakes a review of the issue. The Supreme Court has admonished courts to not tamper lightly with ERISA's enforcement scheme. *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 147, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985). "[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."

*Transamerica Mortgage Advisors Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 97, 101 S.Ct. 1571, 1584, 67 L.Ed.2d 750 (1981). This presumption is especially strong in examining implied claims under ERISA: "[t]he six carefully integrated civil enforcement provisions found in § 502(a) of [ERISA] ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly." *Russell,* 473 U.S. at 146, 105 S.Ct. at 3092. In light of these presumptions, a court determines whether ERISA implies a cause of action against non-fiduciaries by applying the four-factor analysis in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Under *Cort,* a court may imply a cause of action in a statute if:

1) the plaintiff is one of the class for whose benefit the statute was enacted;

2) there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one;

3) such a remedy would be consistent with the underlying purposes of the legislative scheme; and

4) it is appropriate to infer a cause of action based solely on federal law.

*Id.* at 78, 95 S.Ct. at 2088; *see Russell,* 473 U.S. at 145, 105 S.Ct. at 3091. It is beyond dispute that factors one and four above favor an implied cause of action. The legislative intent behind ERISA, however, proves more difficult. Courts that have found legislative intent favoring a cause of action against non-fiduciaries look to the civil enforcement provisions of 29 U.S.C. § 1132, which allow private parties and/or the Secretary of Labor to bring an action to enjoin any act or practice that violates the terms of ERISA or the terms of the plan, and to obtain "other appropriate equitable

relief." [11] These courts infer from § 1132, as well as from the legislative history of the statute, that Congress intended ERISA to federalize the common law of trusts. *See, e.g., Lowen,* 829 F.2d at 1220; *Brock v. Gerace,* 635 F.Supp. at 564; *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wis.1979). Thus, under common law trust principles, these courts argue, non-fiduciaries working in concert with fiduciaries may be held liable under ERISA.

In arriving at a contrary result, the Ninth Circuit in *Nieto* examined the legislative intent behind ERISA by first examining the liability provisions of 29 U.S.C. § 1109(a), which provides that "[a]ny person who is a fiduciary" shall be "personally liable" for any breach of fiduciary duty. The Ninth Circuit concluded that the plain language of the statute limited ERISA's coverage to fiduciaries only, and that had Congress intended to include non-fiduciaries, it would have done so explicitly. *Nieto,* 845 F.2d at 871–74. The court moreover found that interpreting § 1132 to provide causes of action against non-fiduciaries would in effect render § 1109 superfluous, "a result contrary to the fundamental canons of statutory construction." *Id.* at 873.

This Court rejects the Ninth Circuit's reasoning and concludes that ERISA does provide a remedy against non-fiduciaries acting in concert with fiduciaries. ERISA is a comprehensive remedial statute designed to protect the interests of participants and beneficiaries of employee benefit plans. *Eaves v. Penn,* 587 F.2d 453, 457 (10th Cir.1978); *Brock v. Gerace,* 635 F.Supp. at 566. Accordingly, ERISA should be liberally construed in order to carry out its remedial purposes. *Donovan v. Mazzola,* 716 F.2d 1226, 1235 (9th Cir.

1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *Brock v. Gerace,* 635 F.Supp. at 566. ERISA's broad remedial provisions as codified in § 1132, as well as the statute's legislative history, suggest strongly that Congress intended ERISA to federalize the common law of trusts.[12] It is undisputed that under the common law of trusts, a beneficiary may seek relief from a non-fiduciary acting in concert with a fiduciary. *See* Restatement (Second) of Trusts at § 326 (1959). It is beyond dispute that there exist genuine issues of fact concerning Southeast Bank's conduct in permitting the distributions and loans in accordance with Omni directives. *See* Aff. of Marvin Brauth in Opposition to Southeast Bank Motion (July 10, 1989).[13] Accordingly, the Pension Fund may assert a cause of action against Southeast Bank, regardless of its fiduciary status.

This result is consistent with the Supreme Court's ruling in *Russell.* The issue in *Russell* was whether ERISA authorized an action for the recovery of extracontractual damages caused by improper or untimely processing of benefits claims. The Court rejected plaintiff's assertion of an implied cause of action based on a straightforward *Cort v. Ash* analysis. *Russell,* 473 U.S. at 145–48, 105 S.Ct. at 3091–93. Specifically, the Court found that "the voluminous legislative history" of ERISA contradicted any assertion of an implied cause of action for extracontractual damages. *Id.* at 145, 105 S.Ct. at 3092. The instant case is distinguishable, however, on the grounds that the legislative history of ERISA does contemplate the federalization of common law trust remedies. *See* footnote 12, *supra.*

The above result is also consistent with Third Circuit precedent. In *Plucinski v. I.A.M. National Pension Fund,* 875 F.2d

---

**11.** Although the Secretary of Labor may bring a cause of action under a different subsection of § 1132 than private parties, both provide for plaintiffs to obtain "other appropriate equitable relief." *See* 29 U.S.C. § 1132(a)(3), § 1132(a)(5). Consequently, this Court will not distinguish between enforcement actions brought by the Secretary of Labor and private actions for the purposes of this motion.

**12.** For detailed discussions of ERISA's legislative history concerning the federalization of the

common law of trusts, see *Nieto v. Ecker,* 845 F.2d 868, 874–76 (9th Cir.1988) (Wiggins, J., concurring); *Brock v. Gerace,* 635 F.Supp. 563, 566–68 (D.N.J.1986); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wis.1979).

**13.** Southeast Bank argued in opposition only that ERISA did not provide an implied cause of action against non-fiduciaries. It did not argue that there is no genuine issue of fact, assuming they be held liable as non-fiduciaries.

1052 (3d Cir.1989), the Circuit rejected the plaintiff-employer's assertion of an implied cause of action against the plan to recover contributions erroneously made to it because the legislative history of ERISA did not provide for such actions:

> [T]he language of § 403(c)(2)(A)(ii) of ERISA is permissive, simply allowing pension funds to refund monies. Merely giving permission does not imply that Congress also wanted employers to be able to force the refund of contributions.... Indeed, there is no indication in the statute or in the legislative history that Congress intended to give employers any causes of action under ERISA.

*Id.* at 1056. The Third Circuit reached a similar result in *Painters of Philadelphia District Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146 (3d Cir. 1989), in which it rejected on the basis of legislative intent an implied cause of action under ERISA against an auditor for professional malpractice. *Id.* at 1151–53. Finally, in *Trenton v. Scott Paper Co.*, 832 F.2d 806 (3d Cir.1987), the Third Circuit refused to imply a cause of action against a pension fund for creating a "top-heavy" plan. The Circuit reasoned that, assuming a top-heavy plan violated ERISA's requirements for plans, there was nothing in the legislative history of ERISA to suggest that such a violation gave rise to a private cause of action. *Id.* at 810. *Plucinski, Painters,* and *Trenton,* therefore, are distinguishable on the ground that the legislative history and purpose of ERISA supports an implied cause of action in the instant case.

Finally, this Court rejects the reasoning of *Nieto* because it is inconsistent with other Ninth Circuit precedent. *See Donovan v. Mazzola,* 716 F.2d 1226 (9th Cir. 1983), *cert. denied,* 464 U.S. 1040, 104 L.Ed.2d 704, 79 L.Ed.2d 169 (1984). In *Donovan,* the Ninth Circuit held that ERISA required the broadest possible range of remedies for plan beneficiaries. *Id.* at 1235. The holding in *Nieto* appears at odds with this clear policy statement, and is therefore of questionable precedential value. Accordingly, this Court will accept plaintiff's position and allow an ERISA cause of action against Southeast Bank as a non-fiduciary.

## III. THE FEE MOTIONS

 Both Pru–Bache and Southeast Bank have moved for attorney's fees pursuant to 29 U.S.C. § 1132(g)(1). The power to award fees lies in this Court's discretion. *Id.* As neither party has prevailed on its summary judgment motions, an award of fees would be inappropriate at this time. *See, e.g., Carpenters Southern Calif. Admin. Corp. v. Russell,* 726 F.2d 1410, 1415 (9th Cir.1984).

## IV. CONCLUSION

For the reasons set forth above, the Court will deny Pru–Bache's and Southeast Bank's summary judgment motions as to the ERISA claims. The Court also will grant summary judgment in favor of Pru–Bache against the Pension Fund's negligence and third party beneficiary claims. It will deny Pru–Bache's motion for summary judgment against the Pension Fund's assigned claims, and deny both movants' motions for attorney's fees. An appropriate order will be entered.

### ORDER

This matter having come before the Court on motions by Prudential–Bache Securities, Inc. and Southeast Bank N.A. of Miami, Florida; and

This Court having reviewed the submissions of parties and considered the arguments of counsel;

For the reasons set forth in the Court's Opinion of this date;

It is on this 15th day of February, 1990,

ORDERED that Pru–Bache's motion for summary judgment as to the Pension Fund's ERISA claims be and is hereby denied; and it is

FURTHER ORDERED that Pru–Bache's motion for summary judgment regarding the Pension Fund's state law negligence claims be and is hereby granted on preemption grounds; and it is

FURTHER ORDERED that Pru–Bache's motion for summary judgment regarding the Pension Fund's state law breach of contract claims based on the theory that

the Pension Fund is a third-party beneficiary of the brokerage contracts between Omni and Pru–Bache be and is hereby granted on preemption grounds; and it is

FURTHER ORDERED that Pru–Bache's motion for summary judgment regarding the Pension Fund's assigned state law breach of contract claims be and is hereby denied; and it is

FURTHER ORDERED that Pru–Bache's motion for attorney's fees pursuant to 29 U.S.C. § 1132(g)(1) be and is hereby denied; and it is

FURTHER ORDERED that Southeast Bank's motion for summary judgment regarding the Pension Fund's ERISA claims based on the Bank's fiduciary or co-fiduciary liability be and is hereby granted; and it is

FURTHER ORDERED that Southeast Bank's motion for summary judgment regarding the Pension Fund's ERISA claims based on the Bank's non-fiduciary status be and is hereby denied; and it is

FURTHER ORDERED that Southeast Bank's motion for attorney's fees pursuant to 29 U.S.C. § 1132(g)(1) be and is hereby denied.